WHIPPLE, C.J.
The defendant, Joleslie Looney, was charged by grand jury indictment with one count of manslaughter, a violation of LSA-R.S. 14:31.[1] She pled not guilty, but later withdrew the plea and pled not guilty and not guilty by reason of insanity. The trial court appointed a sanity commission to examine the defendant's sanity at the time of the commission of the crime. Thereafter, the State and the defense stipulated to the doctor's reports, and the trial court ordered the matter to proceed. After a trial by jury, the defendant was found guilty as charged of manslaughter. The trial court sentenced the defendant to forty years imprisonment at hard labor. The defendant now appeals, claiming that the sentence is constitutionally excessive. For the following reasons, we affirm the defendant's conviction and sentence.
STATEMENT OF FACTS
In early 2013, Bessie Looney, the victim, was living in Rogersville, Tennessee, near Thomas Looney, III, the victim's son and the defendant's brother, who lived in Kingsport, Tennessee. At that time, Bessie suffered from a bad back and was "getting a little forgetful." Sometime in 2013, Thomas called his sister, the defendant, and suggested that either they place their mother in an assisted living facility in Tennessee or that the defendant move to Tennessee and help him take care of their mother. Sometime between February and April of 2013, the defendant and her *687 daughter, Lauren Looney, brought Bessie back with them to Baton Rouge, Louisiana. Thomas stated that he was sure Bessie could have afforded a good nursing home and that he and Bessie owned several properties. Thomas worked for a paper mill and made a salary in excess of $ 100,000.00. He explained that if the defendant had indicated she needed help caring for their mother, he would have called on one of the members of their large extended family for assistance. Additionally, he had always sent money to the defendant when she asked for assistance, and on the last occasion, he had sent the defendant $ 500.00.
On September 29, 2014, Sergeant Glenn Hutto was called to the home of the defendant in Baton Rouge to photograph the scene of a death. Regarding the condition of the residence, Sgt. Hutto noted that it had a strong, bad odor. In one of the bedrooms, he discovered Bessie dead and slumped over in a wheelchair. Sgt. Hutto testified that the floors were sticky from "some form of waste all over it." When Bessie was removed from the wheelchair by someone from the coroner' office, police officers observed that she had multiple wounds on her lower back and posterior. Her skin had so adhered to the wheelchair's strap that the officers had difficulty removing the strap. Her skin had also adhered to the pad on which she sat. She was nude from the waist down with a dress draped over her head. Corporal Sherri Harris, the lead detective on the case, testified that it appeared someone had attempted to dress Bessie, but was unable to fit the dress onto Bessie's body because of the onset of rigor mortis. Corp. Harris noted that the sheets were the only clean items in the room. When police returned with a search warrant, they discovered that the stench came partially from the closet in Bessie's room. When police opened the door, the swarm of flies that flew out was so thick that the officers were forced to exit the house because they could not breathe without inhaling a fly. The officers discovered that the closet was full of soiled bedsheets, soiled diapers, and "paddings." Additionally, the officers discovered that Bessie's bedroom was "covered in urine and fecal matter" and that it also covered her wheelchair, the bathtub, the bathroom, and the clothes recovered from the closet.
When police officers received information from the coroner regarding Bessie's bedsores, they arrested the defendant and Lauren for cruelty to the infirmed. Bessie's doctor indicated at trial that on April 11, 2013, the last time he weighed her, Bessie weighed one hundred and thirty pounds. He stated that the family told him they had not been giving Bessie her prescribed B-12 shots because they did not have any syringes. He also testified that after May of 2013, there was no indication that Bessie was seen again by any doctor at the Baton Rouge Clinic.
Dr. William "Beau" Clark, the East Baton Rouge Parish coroner and the State's expert witness in emergency medicine, testified that Bessie weighed eighty-two pounds at the time of her death. She also had multiple infected bedsores, one of which extended into the muscle and bone of her right hip. Other bedsores were found on the rest of her body, including her shoulder, elbow, foot, knee, wrist, and hand. Dr. Clark testified that Bessie's cause of death was septic shock as a result of the bedsores becoming infected with bacteria from feces. The autopsy also revealed that Bessie suffered from high blood pressure, Alzheimer's disease, vascular dementia, and osteoporosis and that her kidney functions were consistent with an individual who was dehydrated. The toxicology report revealed that none of the medicines that are used to treat the medical *688 conditions from which Bessie suffered were present.[2]
At trial, the defendant's friend, Cynthia Eagles, indicated the defendant worked for the City of Baton Rouge Public Works Department, and her employers did not appreciate her hard work, and her work environment was "hostile" because she was "bullied" at work. She characterized the defendant as a "hard-working person that struggled a lot" and "a proud person who didn't want people to know about her struggle." Ms. Eagles also testified that the defendant, who did not have a vehicle, never asked her to drive Bessie to the doctor.
Another friend of the defendant, Chinquania Gallo, testified that the defendant had a number of physical ailments and suffered from work stress. She also stated that the defendant struggled with her finances and a lack of transportation. The defendant did not, however, ever ask Ms. Gallo to help her transport Bessie to the doctor or hospital.
Dr. Herman Soong, a psychiatrist, testified that the defendant could distinguish between right and wrong at the time of the offense and that the defendant told him that she was unaware that her mother had bedsores. However, she later told him that she knew of the bedsores, but claimed she was unaware of their severity. The defendant also told Dr. Soong that she waited approximately an hour to call 911 after she discovered her mother had died because she wanted to change the sheets and dress her mother first. Dr. Soong testified that at the time of the offense, the defendant suffered from stress and depression, but did not meet any criteria for a "major mental disorder or depression."
At trial, the jury was instructed that in order to find the defendant guilty of manslaughter, it must find that she was guilty of cruelty to the infirmed.
EXCESSIVE SENTENCE
In her sole assignment of error, the defendant contends that the sentence of forty years, as applied to her at fifty-seven years old, is unconstitutionally excessive because it is essentially a life sentence. She argues that this court should consider the sentence in light of her age and in light of the fact that her issues with depression and work stress, limited resources, and lack of necessary skills rendered her unable "to deal with the situation."
Article I, Section 20 of the Louisiana Constitution prohibits the imposition of cruel or excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. A district court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by it should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Forrest, 2016-1678 (La. App. 1st Cir. 9/21/17), 231 So.3d 865, 872, writ denied *689 , 2017-1683 (La. 6/15/18), 257 So.3d 687.
The Louisiana Code of Criminal Procedure sets forth items that must be considered by the district court before imposing sentence. See LSA-C.Cr.P. art. 894.1. The district court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. Forrest, 231 So.3d at 872.
The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. The trial judge should review the defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. State v. Dufrene, 2017-1496 (La. App. 1st Cir. 6/4/18), 251 So.3d 1114, 1125.
As applicable in this case, manslaughter is a homicide committed, without any intent to cause death or great bodily harm, when the offender is engaged in the perpetration or attempted perpetration of cruelty to the infirmed. See LSA-R.S. 14:31(A)(2)(a) and LSA-R.S. 14:93.3(A). Cruelty to the infirmed, a felony, is the intentional or criminally negligent mistreatment or neglect by any person, including a caregiver, whereby unjustifiable pain, malnourishment, or suffering is caused to the infirmed, a disabled adult, or an aged person, including but not limited to a person who is a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility. LSA-R.S. 14:93.3(A) (prior to amendment by 2014 La. Acts No. 811, § 6). "Caregiver" is defined as "any person or persons who temporarily or permanently is responsible for the care of the infirmed, physically or mentally disabled adult, or aged person, whether such care is voluntarily assumed or is assigned." LSA-R.S. 14:93.3(B) (prior to amendment by 2014 La. Acts No. 811, § 6). "Caregiver" includes but is not limited to adult children, parents, relatives, neighbors, daycare institutions and facilities, adult congregate living facilities, and nursing homes, which or who have voluntarily assumed or been assigned the care of an aged or infirmed person or disabled adult, or have assumed voluntary residence with an aged or infirmed person or disabled adult. Id. An aged person is any individual sixty years of age or older. LSA-R.S. 14:93.3(C) (prior to amendment by 2014 La. Acts No. 811, § 6).
As applicable here, whoever commits the crime of manslaughter shall be imprisoned at hard labor for not more than forty years. LSA-R.S. 14:31(B). The defendant was sentenced to forty years at hard labor. Thus, the defendant received the maximum sentence allowed under the law. Maximum sentences may be imposed only for the most serious offenses and the worst offenders, or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. State v. Parker, 2012-1550 (La. App. 1st Cir. 4/26/13), 116 So.3d 744, 754, writ denied, 2013-1200 (La. 11/22/13), 126 So.3d 478.
At the sentencing hearing, the trial judge found the defendant to be one of the worst offenders and the offense to be one of the worst of its kind. He noted the offense's highly disturbing nature and added that despite the physical violence he has witnessed in murder cases during his lengthy tenure as a judge, he had "never, *690 ever been as affected by a case as I was [in] this one." In finding the defendant to be one of the worst offenders, the trial court noted that the defendant and her daughter "starved her mother to death and left her strapped in a wheelchair[,]" and did not offer her any assistance. He did not "understand how any human being could have done that to anybody, much less their mother." When the defendant attempted to make a statement and said, "Your Honor, the things, it was not like that[,]" the trial judge responded, "Ma'am, I heard the trial. It was exactly like that[,]" and cut her off from speaking further.
The trial court also took note of a letter to the court from Thomas Looney III in which he discussed their mother's caring nature. He stated that he never wanted to have any contact with the defendant or her daughter again.
In light of these considerations, the trial judge, having presided over the trial and having heard all relevant facts and arguments, concluded that the aggravating circumstances outweighed any mitigating circumstances in this case. We agree. A thorough review of the record reveals that the trial court adequately considered the criteria of Article 894.1 and did not manifestly abuse its discretion in imposing the sentences herein. See LSA-C.Cr.P. art. 894.1(A)(2), (B)(1), (B)(2), (B)(3), (B)(4), & (B)(21). Additionally, given the reprehensible circumstances of this case, including the extreme cruelty inflicted upon Bessie, who suffered from dementia and failing physical health and was dependent upon the defendant, for her care, the record provides ample justification for the sentence that the trial court imposed. We find that the trial court reasonably concluded that the defendant was one of the worst offenders and that the instant crime was one of the worst offenses of its kind. The defendant neglected her role as the primary caregiver to her elderly mother to the point of strapping her into a wheelchair, allowing her to lose almost fifty pounds, and not administering any medication for her medical issues. The defendant allowed her mother to develop muscle- and bone-eating bedsores and ultimately stood by and allowed her mother to die of septic shock as a result of infection from the filth in which the defendant allowed her mother to wallow. Therefore, the sentence imposed was not grossly disproportionate to the severity of the offense or shocking to the sense of conscience, and was not constitutionally excessive.
This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
Higginbotham, J., concurs.

The defendant's daughter, Lauren Looney, was also charged with manslaughter.

The coroner's report indicated that in the defendant's home, two bottles of Donepril and one bottle of Amlodipine, all of which were filled in 2014 for quantities of thirty, were discovered. The first bottle, filled on July 1, 2014, had eleven pills remaining; the second bottle, filled on August 11, 2014, had twenty-two pills remaining; and the third bottle, filled on August 11, 2014, had fifteen pills remaining.